# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michele Barnhart,                              Case No.: 0:12-cv-2089 (DWF/FLN)

        Plaintiff,

                                   **PLAINTIFF'S MEMORANDUM IN**
vs.                                            **OPPOSITION TO DEFENDANT'S**
                                   **MOTION FOR SUMMARY**
Regions Hospital,                              **JUDGMENT**

        Defendant.

## INTRODUCTION

Anti-discrimination laws exist to protect not only the employee deemed exemplary by an employer, but equally the imperfect employee who is subjected to disparate and discriminatory treatment in the workplace. *See Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994). Plaintiff Michele Barnhart may not have been a perfect employee, but she had a solid record of performance prior to her discharge, consistently meeting employer expectations in performance reviews for the majority of her four year tenure with Regions. In March 2010, Barnhart was diagnosed with Factor V Leiden, a blood clotting disorder that requires a lifetime of vigilance and monitoring to ensure good health and safety from potentially fatal consequences.[1] Barnhart's condition required Regions to provide her with a reasonable accommodation. Initially, Barnhart's supervisors at Regions appeared

---

[1] On September 2, 2013 Barnhart was hospitalized from an episode of clotting brought about by her Factor V Leiden. (Barnhart Dec. ¶ 7).

understanding and accommodating.  They allowed her to take time off when she needed INRs or infusions as a result of her disability[2].  She was afforded a flexible, later start time, in concert with intermittent FMLA leave, as an accommodation to help facilitate her necessary medical procedures.  Shortly after Linda Moses became her supervisor, Barnhart started experiencing difficulties with her accommodation.  In the months that followed, it became apparent that Barnhart needed her accommodation revised.

Moses took it upon herself to determine the reasonableness of Barnhart's accommodation previously provided and, because of its nature, singled Barnhart out for the absences her treatment demanded.  Significantly, on January 19, 2012, Barnhart made her first complaint of discrimination to her supervisor and a human resources representative and her second complaint on February 2, 2012.  Despite the seriousness of these complaints, no investigation ensued.  On February 3, 2012, Barnhart was terminated.  However, before terminating Barnhart, Regions manufactured grounds for punishing Barnhart that culminated in a one day suspension for "attendance," partially related to a serious injury she experienced on January 13, 2012.

Regions contends that Barnhart's job was terminated in a restructuring, and its decision to lay Barnhart off was not performance related.  Regions' position, however, is untenable.  Her position was "restructured" to a low level scheduling position that

---

[2] INR, a/k/a "prothrombin time" is a blood test that measures how long it takes blood to clot.  http://www.webmd.com/a-to-z-guides/prothrombin-time.  For ease of understanding Barnhart will refer to this as blood-work.

was immediately filled by a temporary worker and then eventually filled by a worker with a skillset nearly identical to Barnhart's.

In its introduction, Regions cites *Harju v. Comrie*, and posits, incorrectly, that Barnhart has no evidence and relies solely on "self-serving deposition testimony" which cannot on its own create a genuine issue of material fact sufficient to defeat summary judgment.  2007 WL 1847248, *6-7 (D. Minn. June 25, 2007).  Regions' position is uncorroborated by any credible law.  In *Harju* the court held that "a naked self-serving affidavit, by itself, in the absence of any evidence in the record, is insufficient to create a genuine issue of material fact in dispute and accordingly is insufficient to defeat a motion for summary judgment." *Harju*, 2007 WL 1847248 at *7.  In that case, the plaintiff submitted nothing more than an affidavit to defeat summary judgment.  However, Fed. R. Civ. P. 56 states that all evidence must be considered, including testimony and affidavits. And courts recognize that for summary judgment purposes, deposition testimony, affidavits, responses to interrogatories, and other written statements may by nature be viewed as self-serving, but this term must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment. *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Viewing the record as a whole and construing the facts in the light most favorable to Barnhart, it is clear that genuine issues of material facts exist sufficient to defeat summary judgment.

## DISPUTED MATERIAL FACTS[3]

Below are examples which demonstrate the existence of genuine issues of material fact.

1.  Regions contended that Barnhart admitted that she was not substantially limited in any major life activities, and claim she is not disabled.[4]  (Regions Mem. 5-6).

1.  Barnhart was hospitalized in spring of 2010 for pulmonary embolisms and blood clots caused by her Factor V Leiden. (Barnhart Dep. 13).  To manage her disorder, Barnhart required blood-work 2-3 times a week plus intermittent transfusions as needed.  (Barnhart Dep. 111). The disorder affects Barnhart's circulatory, and reproductive system.  (Barnhart Dep. 267, 275.)

2.  Denis McCarren stated that performance was not a consideration in her termination.  (Barnhart Dep. 229).

2.  Kathy Agerbeck wrote that the restructuring was necessary because Barnhart was not meeting performance standards.  (Ex. 1).

3.  Regions argued that Carol Droegemueller based her decision to suspend Barnhart on performance issues.  (Regions Mem. 13).

3.  Droegemueller stated that it was Linda Moses' idea to suspend Barnhart.  At the time, Moses was not Barnhart's supervisor. (Droegemueller Dep. 29, 33).

---

[3] This list is not intended to be exhaustive.
[4] Nowhere in her deposition does Barnhart ever say that she is not substantially limited in any major life activities.

4.   Regions argued that McCarren determined he wanted a new position, that he was the architect of the new position, and that it was not Moses' idea to restructure Barnhart's job, she only assisted.  (Regions Mem. 15-16).

4.   Moses testified that she recommended Barnhart's position for restructuring.  (Moses Dep. 115-116).  The new position request listed Moses as an author. (Ex. 2).  McCarren testified that Moses supported the restructure and was part of the management team that conceived and implemented it.  (McCarren Dep. 30).

5.   Regions argued that Barnhart was treated equally and did not report any discriminatory or differential treatment.  (Regions Mem. 36).

5.   Barnhart had knowledge of other employees (JoAnn Niemi and Melinda Cortez) who were held to different reporting for being late or absent.  (Barnhart Dep. 234-235).  Barnhart reported discrimination to Droegemueller on January 19, 2012, just days before she was terminated on February 6, 2012. (Droegemueller Dep. 45).

6.   Moses stated she did not know about Barnhart's FMLA leave, need for time off, or her disability.  (Moses Dep. 78-80).

6.   Barnhart referred to her intermittent FMLA and blood-work in an email to Moses and told her in person.  (Ex. 3; Barnhart Dep. 83-84, 88, 216). Moses also confirmed that she was aware of Barnhart's INR blood-work and infusions. (Moses Dep. 78).

7.   Moses claimed that she did not know Barnhart needed an accommodation to come in to work later than 9:00, and that if she had known she would have given it. (Moses, p. 90).

7.   Barnhart testified that her requests for FMLA leave were ignored. (Barnhart Dep. 88).  Moses told her a later start time could not be accommodated.  (Barnhart Dep. 278).

## STATEMENT OF FACTS

### A. Background

Barnhart began her employment at Regions hospital on January 4, 2008 as a "Scheduling Specialist-Neurosurgery." (Ex. 4). Her duties as a Scheduling Specialist included: scheduling new patient appointments within the neurosurgery department; establishing and maintaining collaborative relationships with others inside and outside of the organization; registering patients and providing insurance verification, and; backing up administrative assistants as needed. (Ex. 5). Barnhart's obligation to verify insurance coverage consisted of checking to see if a patient could be seen by a specific physician, confirming whether they were in-network or out-of-network, and referring patients to the appropriate resource. (Barnhart Dep. 116-117). Barnhart's job duties also included answering phones. (*Id.* at 98, 100; Ewing Dep. 41). Barnhart always understood that if she arrived a few minutes late for work, she would be expected to stay later to make up that time – the important thing was that she hit forty hours per week. (Barnhart Dep. 121).

Although Regions discusses Barnhart's performance in its brief, it is not relevant since her official reason for her termination, in writing, was a "restructure." (Regions Mem. 8-9; McCarren Dep. 3). Indeed, Denis McCarren, Director of Orthopedics & Neurosciences, stated that performance was not a consideration in her termination. (Barnhart Dep. 229). Even so, Barnhart met all expectations in her 2009,

2010, and 2011 performance reviews and was given a raise after each.  (Ex. 6-8; Barnhart Dep. 75-76).

In relatively quick succession, Barnhart received a number of new supervisors. Her original supervisor was Cheryl Sarno, then interim supervisor Jill Goring.  (*Id.* at 77-80).  In or around late August 2011, Linda Moses became her supervisor.  (Moses Dep. 17-18).  Then, in early to mid-January 2012, Carol Droegemueller became her interim supervisor.  (Barnhart Dep. 77-80).  Notably, this was Droegemueller's first time managing people.  (Agerbeck Dep. 24, 28).

## B.  Barnhart Is Diagnosed With Factor V Leiden, Her FMLA Leave, And First Accommodation Under Jill Goring

In the spring of 2010, Barnhart was hospitalized for pulmonary embolisms and blood clots in her legs.  (Barnhart Dep. 13).  These embolisms and blood clots caused her leg and chest pain as well as trouble breathing.  (*Id.*)  Following this incident, Barnhart was diagnosed with Factor V Leiden.  (*Id.* at 100).  Factor V Leiden is a permanent disease that causes blood to over-clot and can cause thrombosis and pulmonary embolisms if not managed properly.  (Barnhart Dec. ¶ 3).  During flare ups or when clots are active, it is very difficult and painful for Barnhart to walk, exercise, or engage in many basic physical activities.  (*Id.*)  Flare ups also cause headaches, stomachaches, and cramping.  (*Id.*)  The medication and treatment of this disorder has the potential to cause blood to clot improperly, which, if untreated can cause death. (*Id.*)  Because of the constantly present dangers of bruising, bleeding, and embolism,

Barnhart is extremely restricted in the physical activities she can safely participate in. (*Id*.).

Another unfortunate side effect of this disorder is that pregnancy can be extremely dangerous and potentially fatal due to the increased risk of clotting, bleeding, and embolism. (*Id*.) Because of the risk factors associated with her disorder, Barnhart is limited by doctor's orders from engaging in physically strenuous activities, becoming pregnant, and participating in any activities that have a high risk of injury. (*Id*.) To help ensure that the maintenance of healthy clotting, it is recommended by her doctors that Barnhart monitor her clotting through INR tests, which reveal the rate at which her blood clots. (*Id*.) When the rate of clotting is not normal, Barnhart requires more tests and treatment. (*Id*.) As a result of her condition, Barnhart requires blood-work 2-3 times per week plus sporadic transfusions when the results of her blood-work are abnormal. (Barnhart Dep. 111). Barnhart's doctors have recommended she get her INR's done in the morning to ensure an accurate reading that will not be affected by diet. (*Id*. at 300).

Following her hospitalization and diagnosis, it became difficult for Barnhart to comply with her initial workplace schedule, which required her to be at work at 8:00 a.m., due to her compliance with her doctor's orders. (*Id*. at 100, 300). After returning from leave for her initial hospitalization, Barnhart had a conversation with Jill Goring about applying for intermittent FMLA, in July 2010. (*Id*. at 202). Goring

assured Barnhart that she would work with her to find a schedule fitting her medical needs.  (*Id*.).

On July 19, 2010 Barnhart submitted her health care provider certification to complete her request for intermittent FMLA leave.  (Ex. 9).  On July 20, 2010, Barnhart's request for intermittent FMLA leave to accommodate her Factor V Leiden was approved.  (Barnhart Dep. 269).  In addition, Goring agreed to provide Barnhart with a flexible start time to accommodate the blood work she had in the mornings.  (*Id.* at 178).  Goring and Sarno (Barnhart's second supervisor) understood that if Barnhart had blood-work in the mornings, she would make every effort to be in the office at a reasonable time.  (*Id.* at 214-215).  Despite this understanding, Barnhart would notify someone at the office if she was going to be late.  (*Id.* at 176).  Because the supervising staff at Regions is generally out on the floor working with patients and unable to check messages, Barnhart made it her practice to leave messages with her supervisor and a co-worker.  (*Id.* at 125; Barnhart Dec. ¶ 4).  Barnhart did this as a courtesy, even though Regions did not require two calls.  (*Id*.).  Sarno never had any issues with the method of Barnhart's notification methods.  (Barnhart Dep. 126).

### C.  Moses Becomes Barnhart's New Supervisor And Holds Her To A Different Standard.

In or around August 29, 2011, Moses assumed the role of interim supervisor over Barnhart and four other employees.  (Moses Dep. 17-18).  After she became her supervisor, Barnhart told Moses about her medical condition and need for blood work.  (*Id.* at 78; Barnhart Dec. ¶ 6).  Moses did not question Barnhart's condition or need for

treatment.  (*Id.*)  Despite this information, and despite Barnhart's declaration to the contrary, Moses claimed in her deposition that she was unaware that Barnhart had informed the company of her need of intermittent FMLA and that she did not know that Barnhart was disabled because Barnhart performed her job.  (Moses Dep. 111).

Under Moses' supervision, Barnhart's flexible start time accommodation lost its flexibility and became an exact start time.  (Barnhart Dep. 215-216).  She directed Barnhart to be in before 9:00 a.m. and to not schedule any medical appointments after 2:00 p.m.  (*Id.*)  While Barnhart initially found the new arrangement with Moses to be reasonable, it soon became apparent that the window for her to receive blood-work in the mornings was too small.  (*Id.* at 21).  Barnhart ended up having to skip appointments in order to make it to work by 9:00 a.m. because of how busy the labs were in the mornings.  (*Id.;Id.* at 196-197).  Sometimes Barnhart would have to wait an hour in order to get her blood drawn.  (*Id.*)  It goes without saying that when the clinics were too busy for Barnhart to receive treatment, there was no record of her visit.  (*Id.*)  This resulted in twelve documented starts after 9:00 a.m. between November 17, 2011 and January 6, 2012, discussed *infra*.  (Ex. 12).  Of those twelve, seven start times were between 9:00 a.m. and 9:10 a.m.  (*Id.*)  When she was late getting to work it was because Barnhart was attempting to receive blood work at a clinic or because her disorder was making her ill – causing stomach aches, headaches, and/or cramps.  (Barnhart Dec. ¶ 5).

Moses also supervised Melinda Cortez is an administrative assistant who worked closely with Barnhart.  (Moses Dep., 10-11, 107-108)  Cortez used to have Barnhart's position and trained Barnhart in.  (*Id*.).  Barnhart and Cortez are the only other hourly employees under Moses.  (*Id*.)

In contrast to her situation, Barnhart observed that when JoAnn Niemi, another administrative employee in Barnhart's department, and Cortez had to miss work, they were allowed to contact the first person available, rather a supervisor.  (Barnhart Dep. 234-235).  Cortez also directly told Barnhart this.  (*Id.* at 237).  Indeed, this procedure was familiar to Cortez because she was frequently late due to non-FMLA related headaches.  (*Id.* at 126-129).

### D. Droegemueller Becomes Barnhart's Interim Supervisor And Continues Adverse Treatment and Retaliation

Beginning in the summer of 2011 through first quarter of 2012, Carol Droegemueller took over as Barnhart and Cortez's direct supervisor.  (Droegemueller Dep. 5-6).  Droegemueller discussed with Barnhart any procedure for calling in  when she would be  late due to treatment.  (*Id.* at 12, 19).

Even though she was Barnhart's supervisor, Droegemueller went to Moses whenever any personnel decisions needed to be made.  (*Id.* at 16).  Droegemueller never had any issue with Barnhart coming in shortly after 9:00 a.m. when she had blood work.  (*Id.* at 21-22).

**E. Regions' Did Not Engage In Any Interactive Process After She Complained of Differential Treatment**

As discussed above, Barnhart's previous supervisors allowed her flexible start and end times as an accommodation for her disability.   Regions reasonable accommodation policy required it to engage in an interactive process after becoming aware of an employee's need.  (Agerbeck, Dep. 9-10; Moses Dep. 109).  This included asking questions about the employee's needs. The policy was always complied with after an employee asked for an accommodation.   In addition, Regions also engaged in the interactive process if it discovered that an employee missed work because of a disabling condition.  (*Id*.)  When it was obvious that an employee's accommodation was not working out, it had been Agerbeck's practice to get further certification from a medical provider or have the employee examined by an in-house medical provider.  (Agerbeck Dep. 32).  Flexible work schedules were routinely provided to employees in need of medical treatment.  (Moses Dep. 145-146).

At one point Barnhart was directed by Moses that she could not schedule medical appointments during work hours.  (Barnhart Dep. 113).  Barnhart feared discrimination and retaliation if she scheduled these appointments during the day.  (*Id.*)  After December 9, 2011 but before December 28, Barnhart apprised Moses that she had to schedule her blood work before work.  (*Id.* at 278).  Moses told Barnhart that she could not be accommodated.  (*Id.* at 299-300).

On January 9, 2012, Moses asked what Barnhart's regular start time was via email.  Barnhart responded that it was 9:00 a.m. and also asked if that was also Moses' understanding.  (Ex. 10).   Despite Moses confirmation that it would have been important for a supervisor to confirm an employee's schedule, Moses never did. (Moses Dep. 152)  Moses then subsequently required Barnhart to notify her directly when Barnhart's FMLA required her to start after 9:00 a.m., despite her knowledge that previous supervisors had allowed Barnhart to notify anyone available at the office. (*Id.* at 83-84, 88).  Barnhart was the only employee required to notify her supervisor directly of an absence or late start.  (*Id.* at 84-85).  Agerbeck, had overseen hundreds of FMLA leaves and could not name a single employee who was required to contact their supervisor directly when utilizing intermittent FMLA leave.  (Agerbeck Dep. 7, 14, 17)

On January 12, 2012, around 10:30-11:00 p.m., Barnhart slipped and fell in a St. Paul parking lot, suffering serious head and facial trauma.  (Barnhart Dep. 137-140).  The fall caused her to lose consciousness.  (*Id.*)  After regaining consciousness, Barnhart called her boyfriend to drive her home.  (*Id.*)   The next morning at 5:00 a.m. Barnhart called Goring, Sarno, and Cortez and left voicemails informing them of what had happened.  (*Id.* at 150).  Around 8:00 a.m., Barnhart finally reached Cortez.  (*Id.*) Barnhart then sought medical attention at the nearby Urgent Care.  (*Id.* at 137-140; Ex. 11).  That same day  Droegemueller informed Barnhart that Linda Moses wanted her back at work by Monday with a doctor's note in hand.  (Barnhart Dep. 153, 239-242).

Barnhart responded that it was against her doctor's recommendations. Barnhart provided Droegemueller a doctor's note on January 17, 2012 and returned to work that same day. (*Id.* at 243).

Moses decided to pull the time records after Barnhart's time off. (Moses Dep. 102-103, 113; Ex. 12; Barnhart Dep. 155-156). She identified 12 times Barnhart apparently came in after 9:00 a.m. between November 17, 2011 and January 6, 2012. (Ex. 12). Seven of the times Barnhart was only minutes late, coming in between 9:01 and 9:10 and on those days she had blood-work done. (Barnhart Dec. ¶ 5). Yet these tardies were counted against Barnhart. (Ex. 12). On January 19, 2012, Barnhart was suspended for one day for allegedly not contacting her supervisor on December 28, 2011 and January 13, 2012. (Ex. 13). During her suspension meeting, Barnhart pleaded with Droegemueller and Agerbeck to reconsider because her absence on December 28 had been preapproved and she called, multiple times, the morning of January 13 to inform Regions of her fall and subsequently provided a doctor's note. (Barnhart Dep. 189). Before issuing the discipline, no one asked or investigated whether her absences were related to Barnhart's disability or FMLA leave. (Moses Dep. 102-103). Indeed, Moses never bothered to check her pager or phone records either. (*Id.*)

Moses alone issued Barnhart's suspension, even though Droegemueller was Barnhart's direct supervisor. (Droegemueller Dep. 29, 31) In writing her summary of

the discussion held before the suspension was issued, Droegemueller relied solely on what Moses told her.  (*Id.* at 37; Ex. 14).

Despite Regions' practice of initiating the interactive process after learning of an employee's difficultly with an existing accommodation, Agerbeck did not engage in any further inquiry after Regions confronted Barnhart on her start times.  (Agerbeck Dep. 48).  She simply asked Barnhart's supervisors if the absences were due to time off for treatment.  (*Id.*)  Agerbeck assumed, without any effort to independently determine, that Barnhart's tardiness and absences were not medically related to her disability despite her previous accommodation.  (*Id.* at 71-72).  Tellingly, Agerbeck did not ask Barnhart to get further medical certification, offer an in-house medical examination, or engage in any further interactive process.  (*Id.*)

Droegemueller failed to engage in the interactive process and admitted that a 10:00 a.m. start time would not have been an undue hardship on Regions. (Droegemueller Dep. 36-37).

## F.  Barnhart's Complains Of Discrimination 15 Days Before And One Day Prior To Her Termination

Also during her suspension meeting with Droegemueller and Agerbeck, Barnhart complained of discrimination.  (Ex. 15).  Barnhart stated that she was being treated differently because she was the only one who was required to get a doctor's note for a single day absence and who had to call in and reach a supervisor for a tardiness or absence.  (Barnhart Dep. 298-299).  She then stated that this disparate

treatment constituted disability discrimination.  (*Id.*)  In Regions' notes taken at the meeting, Droegemueller wrote, "She voiced concern for consistency or lack thereof for similar behavior demonstrated by other team members, wondering out loud if she was ***being singled out***." (Ex. 15) (emphasis added).  Despite the seriousness of Barnhart's allegations, no investigation was ever conducted.   (Agerbeck Dep. 50-51). Droegemueller reported this to Moses and Agerbeck.  (Droegemueller Dep. 45; Moses Dep. 156).   Although she was aware of her affirmative duty to investigate all complaints of discrimination, Moses does not recall if any interviews took place as part of an investigation.  (*Id.* at 156, 158).

Also at this meeting, Barnhart told Droegemueller and Agerbeck that she was no longer being accommodated and her requests were being ignored.  (Barnhart Dep. 205, 207-208).   Droegemueller offered to help Barnhart by reaching out to Moses. (*Id.*)  Despite her offer, no assistance was ever provided.  (Agerbeck Dep. 50).

Following her complaint of discrimination and in reaction to her suspension, Barnhart timely filed a grievance appealing her suspension on February 2, 2012.[5] (Barnhart Dep. 211-213)  In her grievance papers, Barnhart wrote about Moses' failure to adhere to her previous accommodation:

> B.)It had been agreed upon by my previous supervisors Cheryl Sarno
> and Jill Go[]ring that I could flex my start times periodically because
> I was on FMLA for a blood disorder, in which I was subject to

---

[5] Despite opposing counsel's prompting to the contrary during the deposition, the grievance was timely filed, Barnhart's 'Notice of Suspension' clearly states that she has until February 2, 2012 to submit a grievance.  (Barnhart Dep. 211; Ex. 13).

> frequent INR's, Labs, and Transfusions, [Moses] had asked me
> verbally that I schedule these so they did not interfere with phone
> coverage at the end of the day, so I agreed to schedule accordingly
> for coverage purposes.
>
> C.) In the past I had always contacted by co-worker to let her know
> that I would not be in due to illness, because of her early start time, it
> was never an issue prior to this, with other supervisors.

(Ex. 16).

Section C above constitutes Barnhart's second complaint of discrimination because she, yet again, complains of differential treatment due to her blood disorder. (*Id.*) The next day, Barnhart was fired. (Barnhart Dep. 165-166). McCarren and Agerbeck told her that she was terminated because of a reorganization and described it as a layoff. (*Id.* at 219-220). McCarren stated that performance was not a consideration in her termination. (*Id.* at 229). However, this proposition was inconsistent with Agerbeck's notes which stated that Barnhart was not meeting performance standards. (Ex. 1).

### G. Regions' Sham 'Restructure' Was Merely A Subterfuge to Terminate Barnhart

McCarren, the manager to whom Moses reported, was never involved in evaluating Barnhart's performance. He was not aware of any complaint about Barnhart's attendance and was only aware of performance issues related to filling out forms and calling patients. (McCarren Dep. 19-22). Moses admitted that she made the recommendation that Barnhart's position specifically be eliminated:

> "[T]hat position that Shelly held….It was my recommendation that, that position looks like, of the many positions we had, that could allow us to restructure it…"

(Moses Dep. 115-116).

Based upon Moses' recommendation, Barnhart was terminated on February 3, 2012. (Barnhart Dep. 165-66). McCarren and Agerbeck were present at Barnhart's termination meeting. It was represented to Barnhart that it was a layoff and had nothing to do with performance. (*Id.* at 219-220). McCarren admitted that the only justification given to Barnhart for her termination was restructuring. (McCarren Dep. 54). However, in contradiction to what was told to Barnhart, Agerbeck wrote these notes, memorializing the meeting:

> "Michele Barnhart – scheduler Neuro position is being restructured - high level – ***Michelle not meeting performance standards would not be eligible for new role at GHI***."

(Ex. 1) (emphasis added).

McCarren acknowledged that making Barnhart's position a union job actually was not a consideration for the restructure and that Barnhart would have been qualified for the new position. (McCarren Dep. 43, 49). Further, Moses admitted that Barnhart would not have been disqualified from consideration for the new position because of her prior performance issues. (Moses Dep. 175).

Additionally, an email from McCarren sent the same day as Barnhart's termination, stated that a decision had been made to restructure Barnhart's position ***in***

***order to align management and operational processes,*** and that "no other departmental positions…will be impacted at this time." (Ex. 17) (emphasis added).

Droegemueller, despite being Barnhart's direct supervisor at the time, was surprised by Barnhart's termination. She had not even been told or consulted about the plan to eliminate one of her employees. (Droegemueller Dep. 40).

On March 6, 2012, McCarren and Moses put together a new position request that led to the creation of the new position that subsumed Barnhart's duties. (McCarren Dep. 29-31; Ex. 2). Nowhere in the new position request was there any mention of a "need for aligning management and operational processes." In fact, the new position was almost identical to the position Barnhart held with the exception of adding surgical scheduling and handling insurance coverage and authorizations. (*Id.*)

On the Monday following her termination, Barnhart was told by Cortez, Niemi, and Cheryl Sarno that her job had already been taken over by somebody else who was performing her exact same duties. (Barnhart Dep. 223). The temporary position was the same job as Barnhart's. (McCarren Dep. 60-61). McCarren testified that he was not aware of why Barnhart was not allowed to keep her position until the new one was created. (*Id.*)

The only people besides Barnhart affected in any substantive way by McCarren's supposed restructure was her counterpart, Cortez, and Rosanne Loftgren, an orthopedic scheduler in the department. (*Id.* at 45, 58). Regions explains that it was necessary to create a position because the two physicians for whom Barnhart

worked were moved to new positions and no new position was created.  (*Id.* at 45, 66). However, Cortez was allowed to maintain her employment after Regions moved her to an identical position under the umbrella of Group Health Inc. ("GHI").  (Moses Dep. 118-119).  Her job duties remained the exactly the same.  (*Id.*)  Another employee, Lynn Folkerts, was impacted as well but, like Cortez, she kept her job with only a change in title and a new organization signing her checks.  (*Id.* at 119).

All of the other employees supposedly impacted by the restructure actually maintained their employment in some respect. A list prepared on February 7, 2012 titled "NEURO AND ORTHO- EMPLOYER CHANGE" identifies employees affected by the restructure.  (Ex. 18).  It shows that all the other impacted employees were moved from Regions to GHI but were able to keep their jobs.  (*Id.*)  Two of the employees listed actually assumed new positions. (McCarren Dep. 59).  Barnhart and Loftgren are the only employees noted as:  "position will be eliminated."  (Ex. 18). As noted, *supra*, Loftgren's physicians moved to new positions so her scheduling position was no longer existed.

On or around March 26, 2012, Kristin Ewing, became Barnhart's permanent replacement. (Ex. 19).  Ewing worked from the exact same location as Barnhart and performed about 75% of the exact same job duties as her.  (Droegemueller Dep. 55-56).  Likewise, Moses admitted that the new position was comprised of ***all*** of Barnhart's duties plus surgery scheduling and dealing with insurance coverage and

authorization.[6]  (Moses Dep. 121).  McCarren also admitted that Barnhart's position differed from Ewing's only with respect to reporting structure.  (McCarren Dep. 37).  Moses testified that the "additional" duties were "very complex" and could not be learned in a short amount of time.  (Moses Dep. 123-124).  However, Ewing became proficient in a matter of weeks.  (Ewing Dep. 32).  Despite Ewing's qualifications, she admitted that she did not have all of the skills and competencies listed in the new job description when she applied for it.  (*Id.* at 53-54; Ex. 20).

In addition, Barnhart's position was very similar to Cortez's position.  They would often job share.  (Barnhart Dep. 97).  And Moses had no knowledge whether Cortez had ever applied for or taken FMLA leave, had a disabling condition, had requested reasonable accommodation, or had made a complaint of discrimination.  (Moses Dep.  119-120)

Additionally, Ewing had no known FMLA issues or disabilities.  (Ewing Dep. 34-35).  Further, Ewing testified that it was no problem covering the phones when she was on her own and never received any complaints from Cortez about having difficulty handling the phones alone.  (*Id.* at 41).  Ewing believes that if she were late on any occasion her position would be covered. (*Id.* at 42-46).

---

[6] As was stated previously, Barnhart's duties included insurance verification.  (Ex. 5; Barnhart Dep. 116-117).  Therefore, Ewing's job duties consisted of all of Barnhart's previous duties, plus surgery scheduling.

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Minn. R. Civ. P. 56.03.  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Regions' motion for summary judgment must be denied as a reasonable jury could infer from the facts presented that Regions reason for terminating Barnhart was pretext.  It could further infer that the Region's terminated Barnhart in retaliation for using FMLA leave.  A reasonable jury could also easily infer from the facts at hand that Regions discriminated against Barnhart based on her disability, failed to find a reasonable accommodation for her disability, and terminated her in retaliation for reporting wrongful, deferential, and discriminatory practices.

Given the numerous issues of disputed facts in this matter, Regions has not, and cannot, demonstrate that it is entitled to summary judgment and its motion must be denied.

## II.   PLAINTIFF HAS ESTABLISHED QUESTIONS OF FACT EXIST THAT SHE WAS TERMINATED BECAUSE OF HER DISABILITY

The MHRA prohibits an employer from discharging or otherwise discriminating against an employee because of the employee's disability, record of disability, or perceived disability. Minn. Stat. § 363A.02, subd. 1(a)(1). Discrimination may be proved by direct evidence or by circumstantial evidence under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hoover v. Nw. Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001.)  The *McDonnell Douglas* three-part analysis "consists of a prima facie case, an answer, and a rebuttal." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn. 1983.)

Generally, a plaintiff establishes a *prima facie* case of disability discrimination if she demonstrates that she (1) is disabled within the meaning of the MHRA; (2) was otherwise qualified to perform the essential functions of the job at issue, with or without reasonable accommodation; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *See, e.g. Mallon v. U.S. Physical Therapy, Ltd.,* 395 F. Supp.2d 810, 816 (D. Minn. 2005). A prima facie case creates a rebuttal presumption of discrimination. *Lake v. Yellow Transl., Inc.*, 596 F.3d 871, 873 (8th Cir. 2008).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment actions. If the defendant is able to do so, then the plaintiff must demonstrate to the Court that genuine issues of fact exist that the reasons defendant offers for its conduct "were not its true reasons, but were a

pretext for discrimination." [7] *Id.; Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997).  Plaintiff has met her burden.

## A.  Barnhart Has Established a Prima Facie Case of Disability Discrimination

### 1.  *Barnhart is a Disabled Individual within the Meaning of the MHRA.*

Under the MHRA, a disabled person "has a physical, sensory, or mental impairment which materially limits one or more major life activities," has a record of such an impairment or is regarded as having such an impairment   Minn. Stat. 363A.03, subd. 12.[8] Because the MHRA does not define major life activity, Minnesota courts have relied on the equivalent federal statute, the Americans with Disabilities Act (ADA) for guidance on the term. *McLain v. Andersen Corp.*, 567 F.3d 956, 967 (8th Cir. 2009). Effective January 1, 2009, the ADA was amended and the definition

_____

[7] The Court must reject Defendant's suggestion in its memorandum at p.  21, f.n. 23 that the Court should apply a "but-for" standard to the discrimination claims in this case. Well-established Minnesota caselaw holds that the question is whether membership in the protected class "played a role in" or was a "substantial causative factor" in the discriminatory decision. *Goins v. West Group*, 635 N.W.2d 717, 722 (Minn. 2001) (*citing International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)); *see also Anderson v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 624 (Minn. 1988) (observing that discrimination occurs when the discriminatory trait is "a substantial causative factor" in the challenged discriminatory decision.).

[8] In 1989 the Minnesota Legislature amended the definition of "disability" under the MHRA from "substantially limitation" to "material limitation." The intent of this change was to make the state law less stringent than the federal standard under the ADA.  *Hoover v. Norwest Private Mortgage*, 632 N.W.2d 534, F5 (Minn. 2001). Otherwise, claims under the MHRA are analyzed the same as the ADA.  *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 679 (8th Cir. 2001)

of major life activities was expanded to include not only general "activities" such as "performing manual tasks, eating, sleeping, walking, lifting, bending, and working," but also "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, **circulatory**, endocrine, and **reproductive functions**." 42 U.S.C. 12102(1) (*emphasis added*). Consistent with the statute, ADA regulations define an "impairment" to include, "[a]ny physiological disorder, or condition" affecting one or more body systems." 29 C.F.R. 1630.2(h)(1). The regulations further state " the term 'major' shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a 'major life activity' is not determined by reference to whether it is of "central importance to daily life." 29 C.F.R. 1630.2(i)(2).

At the time of her termination, Barnhart was diagnosed with and suffered from Factor V Leiden (a blood clotting disorder) and Anemia. Each of these disorders drastically impact Barnhart's circulatory system. If these conditions are not carefully monitored with regular blood-work and treated with infusions when necessary, Barnhart runs the risk of developing pulmonary embolisms and blood clots that can be potentially fatal. As a result of this disorder, Barnhart's reproductive functions are also impaired as pregnancy creates added risk of health problems for both the mother and child.

Given the definitions under the amended ADA and Plaintiff's condition, Regions is hard pressed to deny that Barnhart's medical condition is an impairment of a major life activity—it is a physiological disorder or condition that substantially limits major life activities such as circulation and reproduction.

Despite the clarity of the definitions in the amended ADA, Regions claims she has no disability at all, seeming to imply that if she can do her job, she is not disabled. In making this claim Regions only cites cases where the terminations occurred before 2009, and therefore are reliant on the pre-amendment definitions of major life activities.[9]  For discriminatory conduct post-dating January 1, 2009,  courts should be applying  the definitions of impairment and major life activities established through the amendments at 42 U.S.C. 12102(2) and 42 C.F.R. 1630.2. *See e.g.*, *McCracken v. Carleton College,* CIV. 11-3480 MJD/JJK, 2013 WL 4516333 (D. Minn. Aug. 26, 2013) (applying amended version of the ADA because the discriminatory conduct occurred after January 1, 2009).

Barnhart has met the first prima facie requirement.

## 2.  *Barnhart Was Qualified*

Barnhart met the required qualifications of her position as a Neurosurgery Scheduling Specialist, and was able to perform her job for four years consistently meeting expectations in performance reviews.  Regions readily admits that Barnhart was not fired for performance issues and would have been qualified for the new

---

[9] For example, it cites *Pandey v. Bio-Med. Applications of Minnesota, Inc.*, 651 F. Supp. 2d 969 (D. Minn. 2009) as relevant, but the plaintiff was terminated in 2007, making the ADA amendments inapplicable.

position that was created as a result of the restructure. McCarren testified to that fact, and Moses even went as far as to say that Barnhart would not have been disqualified from the new position because of her performance. That should be the end of the matter.

To argue as Defendant did, that Barnhart was not qualified for her job because of performance while in the same breath arguing that she was not fired because of performance, and was qualified for a position containing all the same duties and a few more, is patently absurd. Barnhart was capable of performing all of the essential functions of her job, with reasonable accommodation. Regions failed to offer sufficient evidence to support its claim that Barnhart had deficient attendance to a degree that she was unable to perform her job. The one document chronicling Barnhart's late arrivals identifies twelve instances of lateness, seven of which were under ten minutes,. In no instance did anyone at Regions make any effort to ascertain whether on any of those dates Barnhart either called in according to the correct policy, or was late because of medical necessity relating to her FMLA leave or disability.

Despite Regions attestations to the contrary, Barnhart was able to get to work on time and was otherwise qualified for her position.

### 3. Barnhart Suffered from an Adverse Employment Action

It is undisputed that Regions terminated Barnhart from her employment.

### 4. The Circumstances of Barnhart's Termination Give Rise to an Inference of Discrimination

Barnhart also has offered evidence meeting the final prima-facie requirement—showing that she was discharged under circumstances giving rise to an inference of discrimination.  The evidence required here is "minimal." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 12-2129, 2013 WL 450458, *5 (8th Cir. Aug. 26, 2013). Moreover, "evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). Accordingly, Barnhart will rely on her proof of pretext to demonstrate that she has satisfied the requirements for a prima-facie claim of disability discrimination. *See Id.* at 874-76 (analyzing plaintiff's pretext evidence in lieu of separately analyzing the fourth element of a prima-facie case)

### B.  Regions' Business Reason

Plaintiff challenges the legitimacy of Regions' business reason for terminating Plaintiff.  Regions claims that Barnhart's position was restructured and eliminated, but as discussed below, this business reason was a contrivance to terminate Barnhart.

### C.  Genuine Issues of Fact Exist that Regions' Reasons For Barnhart's Termination Are Not the True Reasons, but a Pretext for Discrimination

Once the employer answers by articulating a non-discriminatory reason for the discharge, the employee must offer evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 323 (Minn. 1995) (citing *Texas Dep't of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981)). Under Minnesota law, Barnhart does not have to prove that the reasons given by Regions for her termination are false, only that they are not the true reasons. *See e.g.*, *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017-18 (8th Cir. 2005) (recognizing that "discrimination may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action"); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 n.8 (8th Cir. 1994) (finding that pretext may be established even if the evidence did not directly contradict or disprove defendant's reason for the termination); *see also Johnson* WL 4504589 at *7. Indeed, the Minnesota Supreme Court has held that the broad remedial purposes of the MHRA would be defeated if an employer could avoid all liability for discrimination by proving "that other legitimate reasons may coincidentally exist that could have justified the discharge," *Anderson,  v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 626 (Minn. 1988).

Nor does Barnhart have to show that discrimination was the sole, or even primary reason for her termination." *McGrath v. TCF Bank Sav., FSB,* 502 N.W.2d 801, 806 (Minn. App. 1993) *modified,* 509 N.W.2d 365 (Minn.1993).  She only has to offer evidence that discrimination "'more likely than not' motivated the discharge decision." *Id.* 509 N.W. at 366; *see also, e.g.*, *Anderson*, 417 N.W.2d at 625-26 (Minn. 1988) (holding standard for discrimination in MHRA claims is "motivating factor," notwithstanding the standards federal courts apply in Title VII claims).

Moreover, "[t]he plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification may be false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 147–48 (2000); *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998). The U.S. Supreme Court has held:

> "[p]roof that the defendant's explanation is unworthy of credence * * * may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is * * * cover[ing] up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In finding pretext, the factfinder must decide "whether the employer gave an honest explanation of its behavior." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994); see also *Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981). Further, if the employer's stated reason(s), assuming they are true, do not adequately explain the employer's actions, the inference can be drawn that the reason is pretextual. *Blake v. JCPenney*, 894 F.2d 274 (8th Cir. 1990). We know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more than likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as [disability].

*Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Minnesota courts look at numerous factors when determining the issue of pretext, including whether the employer's proffered reason has any basis in fact; the employee received a favorable review shortly before termination; similarly situated employees were treated leniently; the employer changed its explanation for firing the employee; or the employer deviated from its policies. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 152 (8th Cir.2006).

### D. `Regions Reason for the Restructure Has No Basis in Fact

Regions' proffered reason for Barnhart's termination is that a restructure was necessary to align management and operational procedures, and Barnhart's position apparently needed to be terminated as part of that restructure. The fact that this was a restructure involving only one position makes it suspicious from the start, as does the fact that immediately following the Barnhart's termination somebody else was put in Barnhart's position, fulfilling the same role and duties for about a month before Ewing took over as the permanent replacement.  Region gave no reason why Barnhart couldn't stay at her job until the position was actually restructured.  Even though this "alignment" was claimed to be necessary, the actual changes involved only the elimination of two low-level nearly identical clerical positions, and the claimed creation of a new also nearly identical position in the exact same location where Plaintiff had worked,  just a month later, and with a different title and under a different employer.  McCarren even testified that the only real change was a change in reporting structure.  Ewing's position contained all the same duties as Barnhart's with the addition of scheduling responsibilities for two more doctors. The learning curve on these alleged new duties was approximately a "few weeks."  Every other employee in the department whose position changed employer groups moved with the position and was allowed to continue working as they had before.  Droegemueller, Barnhart's direct supervisor at the time, was completely surprised by Barnhart's termination. Nobody had told her it was happening or that there was to be a restructure.  A jury could easily

find that the claimed restructure was a subterfuge or sleight-of-hand to make it look like Barnhart's position was, when it really wasn't. By itself, this fact can establish pretext. *See St. Mary's Honor Center v. Hicks*, 113 S.Ct 2742, 2749 (1993) (holding that where there is a "suspicion of mendacity" disbelief of the defendant's reason may be enough with the prima facie case to establish intentional discrimination).

### III.   SIMILARLY SITUATED EMPLOYEES WERE TREATED MORE FAVORABLY COMPARED TO BARNHART

Another significant way that Barnhart can raise an inference of discrimination is to show that she experienced disparate treatment as compared to similarly situated non-disabled employees. *See e.g.*, *Lake*, 596 F.3d at 874 (stating that pretext may be shown by showing that an employer "treated similarly-situated employees in a disparate manner"); *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (same). The similarly situated analysis is a common sense, flexible, examination of all relevant factors. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citing *Henry v. Jones*, 507F.3d 558, 564 (7th Cir. 2007)).

In this analysis what is important is that the persons being compared are similarly situated in "all relevant respects." *Harvey*, 38 F.3d at 972. When the disparate treatment involves differing discipline, this typically means that the employees have the same supervisor and are subjected to the same disciplinary standards. *Id.* at 721; *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003). If the

employees also engaged in the same conduct, that, too, would support finding they were similarly situated. *Id. Harvey*, 38 F.3d at 972.

Barnhart has offered evidence that she was treated differently than her non-disabled co-workers who reported to Moses with respect to how they were required to call in when they were going to be late and the discipline that was administered to Barnhart, but not to her co-workers for the same manner of handling late arrivals.

 Barnhart has also offered evidence that Melinda Cortez was treated more favorably in the claimed "restructuring." At the time of Barnhart's termination, Cortez was an administrative assistant working in the same space as Barnhart and reporting to the same supervisors.  (Cortez formerly held the position that Barnhart was terminated from, and at one point they even job shared.)  Cortez was the only other hourly employee under Moses.  Regions' management was unaware of any disability, FMLA taken or applied for, or discrimination complaints from Cortez. However, post-restructure, Cortez continued working in a job with a different title, under a different employer, but with exactly the same duties she had previously held, while Barnhart was left with no position at all and therefore terminated.

In both of these instances, non-disabled, non-complaining employees similar to the Plaintiff in all material respects were treated more favorably. By itself, this is sufficient to establish pretext.

## IV.   REGIONS CHANGED ITS EXPLANATION FOR TERMINATING BARNHART

A shift over time in a company's explanations of its actions may support an inference of discrimination. *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994). This is because a jury may infer that inconsistencies in the reasons offered prove that the offered reasons are not the true reasons for the conduct. *Young*, 152 F.3d at 1023. Here, Regions kept changing its explanation of its basis for terminating Barnhart.

In her termination meeting, Barnhart was told by McCarren and Agerbeck that her position was being eliminated because they were moving it into a union position as part of the restructure.  However, Agerbeck wrote in her notes that there was going to be a high level restructure and as Barnhart was not meeting performance standards, she would not qualify for the new position.  In his email to the neurosciences department McCarren said that Barnhart's specific position was being restructured, and no other positions were to be impacted by the restructure.  Later a document was put together outlining the employer changes taking place in the department as a result of the restructure, and multiple people were listed who did not actually change positions.

Almost a full month after Barnhart's termination, Moses put in a "New Position Request" for a "Neuroscience Surgery Scheduling Technical Assistant," a position nearly identical to Barnhart's former position as "Scheduling Specialist-Neurosurgery."  Nowhere in this document does it ever mention that this position is needed to fulfill a new need. Instead, it describes at length a dire need for the position

based on the vacancy in the department created by Barnhart's termination, *e.g.* lack of phone coverage due to demand, low percentage of calls answered, increased delays for patients, forcing other staff to have direct contact with patients, and a general lack of clerical support. In other words, Barnhart was told she was terminated because they were restructuring her position, but after the fact, Moses put in a requisition for the position they had allegedly already restructured. It doesn't make sense, and that is evidence of pretext. *See e.g.*, *Young*, 152 F.3d at 1023.

## V.    UNDER CAT'S PAW LIABILITY, MOSES ACTED INTENTIONALLY TO CAUSE MCCARREN TO TERMINATE BARNHART

Regions tries to isolate discriminatory animus by arguing that McCarren was the person ultimately responsible for Barnhart's termination.  They try to minimize liability by claiming that McCarren was upper level management and had little dealing with or knowledge of Barnhart, her position, or any of Moses' retaliatory and discriminatory discipline practices.  That being said, under a "cat's paw" theory, the liability must be imputed to McCarren and the company in general because of the discriminatory and retaliatory intentions of Moses, who worked hard and succeeded in getting Barnhart fired.

Under cat's paw  liability, if a non decisionmaker performs an act motivated by discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer is liable.  *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958 (8th Cir. 2012).

Moses clearly had a discriminatory and retaliatory animus towards Barnhart. From the moment Moses became direct supervisor of Barnhart she took issue with Barnhart's disability, use of FMLA, and her reports to other supervisors about Moses' differential treatment.  Moses concocted a series of disciplinary actions and a record of poor performance all centered on Barnhart's receiving medical treatment and being slightly late on occasion to work.  Moses was an integral part of organizing the restructure, recommending Barnhart's position for termination, and creating the new position including interviews and determining qualifications.  Barnhart was terminated as a result of Moses' discriminatory and retaliatory bias and actions, making Regions liable for disability discrimination, and, as discussed below, discriminatory retaliation.

A court must consider all of the evidence offered and must consider the record as a whole when deciding whether a discrimination claim under the MHRA is triable. *See e.g.*, *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005) *Strate*, 398 F.3d 1020 (stating that evidence that may not alone create a genuine issue of fact "can be relevant when considering whether the record as a whole establishes a genuine issue of material fact"). The bases for pretext above, taken individually and together show that the reasons given for Barnhart's termination were not the reason reasons and that her disability at least played a role in her termination.

## VI.  A JURY CAN FIND THAT REGIONS VIOLATED THE FMLA

The Family and Medical Leave Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

provided under" the FMLA. 29 U.S.C. § 2615(a)(1). It is also unlawful for an employer to discriminate "against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). Plaintiff's two-fold FMLA claims are that Defendant interfered with her rights under the FMLA, and retaliated against her for the exercise of those rights. Plaintiff starts with her claim of retaliation.

## A. Defendant Retaliated Against Plaintiff for Exercising or Attempting to Exercise Her FMLA Rights

To establish a *prima facie* case of retaliation under the indirect method, Barnhart must show that she (1) engaged in protected activity under the FMLA, (2) suffered an adverse employment action, and that (3) a causal connection exists between the protected activity and the adverse employment action. *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002-03 (8th Cir. 2005). Upon a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for termination. *Id*. If the defendant meets this burden, the plaintiff may show the articulated reason is pretextual, or, essentially, provide evidence allowing a jury to conclude whether the illegitimate reason was more likely than not the reason for discharge. *Id*. Regions only disputes causation.

### 1. The Circumstances Surrounding Barnhart's Termination Give Rise to an Inference of Discrimination for Exercising FMLA Rights

A pattern of adverse actions that occurs just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement. *See Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105-06 (8th Cir. 2000) (finding causation established

through extensive pattern of protected activity followed by disciplinary measures);

*Hudson v. Norris*, 227 F.3d 1047, 1051 (8th Cir. 2000) (large number of adverse

actions within four months of protected activity).

As discussed above, Regions engaged in an unrelenting attack on Barnhart after

she engaged in the protected activity of using her FMLA leave under the direct

supervision of Moses. Clearly, Moses used her taking leave, or attempts to take leave,

as a negative factor. *See 29* C.F.R. § 825.220(c) (prohibiting an employer from

viewing an employee's use of FMLA as a negative factor in employment actions).

Barnhart applied for and received intermittent FMLA leave from Regions. She

understood that Regions was allowing her to use that leave and the flexible start time

as an accommodation for her disability. She rightfully believed that she was able to

seek medical treatment as necessary, and would not be punished when it caused her to

be late for work. In fact, this is how things operated at Regions for well over a year.

Then Moses became Barnhart's direct supervisor. In reaction to Barnhart's

exercise of her intermittent leave and flexible start time, Moses asked Barnhart to

agree to be at work by 9:00 a.m. and not to schedule her medical appointments after

2:00 p.m. Barnhart agreed to this. But over time it became apparent to Barnhart that

this arrangement would not work because the blood-work that needed to be done in the

mornings sometimes took longer than the time she was allotted. Barnhart began

coming in late more frequently and Moses began punishing her with written

reprimands and suspensions. Then, a few weeks after her suspension Barnhart was terminated in a pretextual restructuring orchestrated by Moses.

Defendant engaged in no interactive process to determine if a reasonable accommodation could be met by allowing Barnhart to use her FMLA leave on days she was seeking medical treatment. Instead, in a mere four month span Barnhart received two disciplinary actions related to attendance, and had her employment terminated, a direct result of her attempting to utilize her intermittent FMLA for medical treatment.

Regions argues that the causal link is broken because there is too much time between when Barnhart was granted intermittent FMLA leave and the time she was terminated. This argument elevates form over function because it ignores the compelling fact that Barnhart's termination occurred immediately following a change in supervisors. This is not a case where an employee takes protected FMLA leave, returns, and then is fired a year and a half later.  When temporal proximity is a factor, courts have found a causal link under facts like this that appropriately raise a suspicion of illegal motive.  *See e.g.*, *Krutchen v. Zayo Bandwidth Ne., LLC*, 591 F. Supp. 2d 1002, 1015-1016 (D. Minn. 2008) (finding causation for retaliation after five years span of time because it was only then that particular executives were in a position to fire the employee); *Aronson v. Health Care Excel, Inc.*, 1:05CV1181 DFHWTL, 2007 WL 3091579 (S.D. Ind. Oct. 19, 2007) (finding causation where retaliation occurred after persons were promoted and in a position to retaliate); *Eversole v. Spurlino*

*Materials of Indianapolis, LLC*, 804 F. Supp. 2d 922, 935 (S.D. Ind. 2011) (finding that long periods do not negate causality under suspicious circumstances). Also, a reasonable juror can find causation where time has passed because an employer waited for or created an event like a RIF to terminate an employee. *See e.g.*, *Powell v. State*, A06-1314, 2007 WL 1674667 (Minn. Ct. App. June 12, 2007) (finding a causal link after several months where an employer used a budget crisis to justify terminating an employee) *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436-37 (6th Cir. 2009) (finding causation where employer waited for and ultimately contrived a reason to terminate employee).

Regions additionally claims that Barnhart's use of FMLA leave was not tracked, and she was granted flexibility and accommodation. This is not true. Barnhart had her flexibility and accommodation taken away under Moses and Droegemueller and was in fact told not to schedule appointments or seek treatment during certain windows of time.

Regions finally argues that Barnhart was not punished for using untracked FMLA time but for failing to adhere to the proper call-in procedure.  The case it cites for this proposition, *Thompson v. CenturyTel of Cent. Arkansas, LLC*, 403 F. App'x 114, 118 (8th Cir. 2010), is clearly distinguishable. In *Thompson* the employee violated the company's usual and customary policies. *Id.* at 118.  Here, Barnhart followed the prescribed policy for taking leave and calling in for over a year without incident. Moses then created new policies and procedures specifically for Barnhart that were not

"usual and customary" and that restricted and discouraged her from taking FMLA leave. That the requirements placed on Barnhart are not "usual and customary policies" is evident in the fact that the employee that replaced Barnhart (Ewing) has no restrictions on when she can take time off, and is not required to call a supervisor if she is going to be late. To the contrary, Ewing has been led to believe that if she is late her position will be covered. Not surprisingly, Ewing does not suffer from a disability, and did not seek or utilize FMLA leave.

With respect to the remainder of proof for this claim, Plaintiff relies on her arguments above related to Defendant's business reasons and Plaintiff's establishment of questions of fact as to pretext.

### B. Defendant Interfered with Plaintiff's FMLA Rights

The Eighth Circuit does not apply the *McDonnell Douglas* burden shifting analysis to interference claims. *Rankin v. Seagate Tech., Inc*., 246 F.3d 1145, 1148 (8th Cir. 2001). The burden to establish an interference claim is less than that of a retaliation claim, which requires evidence of the employer's motive. *Stallings v. Hussmann Corp*., 447 F.3d 1041, 1050 (8th Cir. 2006). Interference includes refusing to authorize leave, discouraging leave or avoiding responsibilities under the Act.

To say that Regions in this case discouraged Barnhart from taking FMLA leave or attempted to avoid its responsibilities would be an understatement. As the record shows, despite a need for medical monitoring and treatment on a recurring basis, Barnhart's supervisors Moses and Droegemueller, gave Barnhart a one hour window at

the beginning of the day to seek treatment, and when Barnhart was unable to accomplish that in the amount of time given, she was punished.  Because of the schedule provided by Moses and the punishments given by Moses and Droegemueller, Barnhart was discouraged to the point that she was forced to sometimes skip having her blood-work done in order to accommodate the strict schedule. Clearly questions of fact exist that Defendant interfered with Barnhart's rights.

Finally, because Barnhart's use of FMLA intermittent leave was also an accommodation of her disabilities, Moses' disciplining her for using the leave was yet additional retaliation. It is illegal for an employer to penalize an employee for use of a reasonable accommodation. *See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, October 17, 2002, at 14/45.[10]

## VII.   A JURY CAN FIND THAT REGIONS FAILED TO PROVIDE A REASONABLE ACCOMMODATION TO BARNHART

The MHRA provides that "[i]t is an unfair employment practice for an employer….not to make a reasonable accommodation to the known disability of a qualified disabled person….unless the employer….can demonstrate that the accommodation would impose an undue hardship.  Minn. Stat. § 363A.08, subd. 6.  A qualified disabled person is one who, with accommodation, can perform the essential functions required for the job.  Minn. Stat. § 363A.03, subd. 36.

---

[10] http://www.eeoc.gov/policy/docs/accommodation.html.

Accommodation means "that an employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wisc. Dept. of Admin.,* 44 F.3d 538, 542 (7th Cir. 1995).  An employer must engage in an "interactive process" to identify a feasible accommodation. *Fjellestad v. Pizza Hut of Am., Inc*., 188 F.3d 944, 951-52 (8th Cir. 1999).  An employer's failure to engage in this process may also result in liability.  Minn. Stat. § 363A.08, subd. 6(a).

In a reasonable accommodation case, Barnhart must first show that she has a disability, was qualified, and that she suffered an adverse employment action. *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).  As discussed above, Barnhart has established these elements. She also needs to show that her employer knew of her disability and failed to make a reasonable accommodation for it.

## A. Regions Knew that Barnhart was disabled

Regions' claim that it did not know that Barnhart was disabled is groundless. Regions cites *Phillips v. City of* Dayton, No. C9-1418, 2000 WL 224887 (Minn. Ct. App. Feb. 29, 2000) for the proposition that knowledge of a medical condition is insufficient to establish knowledge of a disability. In *Phillips* the "medical condition" was a need to use the bathroom more frequently. *Id.* at *2.  Here, the Defendant (a hospital) knew that Barnhart had a serious blood condition that required regular monitoring and occasional blood infusions. It defies logic to claim that this was not knowledge of a disability, particularly since Regions admits that it was aware of her

medical condition and since Regions admits that it had already accommodated it by allowing a flexible start time, among other things.

### 1. *Regions Failed in its Obligation to Engage in an Interactive Process to Accommodate Barnhart's Disability*

Barnhart is only required to make a "facial showing that reasonable accommodation is possible." *Fjellestad* 188 F.3d 944 at 950. Once she makes that facial showing, "[t]he burden then shifts to the employer to show that it is unable to accommodate the employee." *Brannon*, 521 F.3d at 848 (internal quotation marks omitted). Whether a reasonable accommodation exists is often a fact question to be decided by the jury. *See Equal Empl't Opportunity Comm'n v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007); *see also Fjellestad*, 188 F.3d at 944 at 952 (noting that an employer is not required to engage in an interactive process if "no reasonable accommodation was possible" but that the failure to engage in the process to "determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith").

Here, Barnhart returned to work with a medical condition that requires her to, based on need, receive infusions, and regularly have blood drawn and analyzed to ensure proper health. She requested intermittent FMLA leave, which was granted and was told that Defendant would accommodate her condition. The necessary blood-work had to be done at a clinic, which opened at 8:00 a.m., and it takes on average a half hour to an hour for the procedure. It would have been a reasonable accommodation to

allow Barnhart's start time to be 10 a.m., or in the alternative to have a flexible start time within reasonable boundaries.

Where the need is obvious, courts have held that the disabled employee need not make a formal request for an accommodation. *See, e.g., Taylor v. Phoenixville School District,* 184 F.3d 296, 313-14 (3d Cir. 1999) (finding obligation to engage in interactive process triggered by notice that employee might have a disability; employer knowledge of specific name of employee's condition was not essential); *Zivkovic v. Southern Calif. Edison Co.,* 303 F.3d 1080, 1089 (9th Cir. 2002) (requiring disabled employee only to inform employer of need for accommodation due to a medical condition and not requiring particular language); *EEOC v. Chevron Phillips Chemical Co., LP,* 570 F.3d 606, 621 (5th Cir. 2009) (requiring disabled employee only to explain medical need).

Barnhart understood her accommodation to include a 'flexible' start time, operating under that assumption she worked successfully for the better part of four years. Once Moses became direct supervisor, Barnhart's accommodation was changed to the requirement that she be in by nine. While Barnhart initially agreed to this start later start time accommodation, she was unable to have her treatment and make it into work on that schedule. Barnhart made it clear to Moses, Droegemueller, and Kathy Agerbeck that the time constraints imposed by Moses were not working as an accommodation of her need for medical monitoring and treatment, yet Regions failed to do anything to address her need for accommodation.

Had Regions engaged in an interactive process, it could have accommodated Barnhart's disability and given her either a later start time or a flexible start time within a reasonable range "[B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." *Fjellestad*, 188 F.3d at 953 (quoting *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). Regions' complete failure to engage in an interactive process supports a finding of bad faith, allowing a jury to reasonably conclude that the Barnhart would have been able to perform her job with the simple accommodation of a later or flexible start time.

## VIII. A JURY CAN FIND THAT REGIONS TERMINATED BARNHART IN RETALIATION FOR REPORTING WRONGFUL, DIFFERENTIAL, AND DISCRIMINATORY TREATMENT

To defeat summary judgment in a retaliation claim, Barnhart only need raise a question of fact that (1) she engaged in protected conduct; (2) she suffered adverse employment action; and (3) there is a causal connection between the two. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001). Then, assuming that Defendants have offered a legitimate non-retaliatory reason their adverse employment actions, Barnhart must establish evidence of pretext. *Id.* at 545-547. The Of the prima facie elements, only issues (1) and (3) are in dispute.

### A. Barnhart Engaged in Protected Activity

To prove that she engaged in a protected activity, Barnhart only has to show that she opposed employment conduct that she believed in good faith was discriminatory. Minn. Stat. 363A.15(1); *Dixon v. Mount Olivet Careview Home*, CIV. 09-1099 MJD/AJB, 2010 WL 3733936 (D. Minn. Sept. 17, 2010). In a meeting with her then supervisor Droegemueller, and her HR partner Kathy Agerbeck on January 19, 2012, Barnhart complained that she was being subjected to discrimination because of her disability. Then she described specific facts that showed this. Among other things, she described how she was not being accommodated, how she couldn't get her supervisor to respond to her, how she was being treated differently and singled out by having to get FMLA paperwork or a doctor's reports for when she was gone when others didn't have to do that.

Regions argues that this does not constitute a good faith report because Barnhart said she "felt" she was being discriminated against[11] and she complained about other treatment that may not constitute discrimination. In *Dixon*, which was cited by Regions, the court found statutorily protected conduct where an employee stated in a letter that she "*felt* that white employees were treated more leniently than black employees with regard to absences" and then gave examples of how this happened. *Dixon v. Mount Olivet Careview Home*, 2010 WL 3733936, at *7 (emphasis added). Barnhart did the same thing here. Besides saying that she "felt" she was the

---

[11] Contrary to Defendant's assertion that Barnhart did not mention her alleged disability or discrimination, she testified that she indicated during the meeting that she was being discriminated against because of her disability and that she "felt like I was being discriminated against." Barnhart 298.

victim of discrimination, she provided facts supporting that claim that, if proven true, would constitute discrimination.

Barnhart has set forth sufficient evidence that she engaged in a statutorily protected activity and that she suffered an adverse employment action. The only remaining question is whether she can establish a causal connection between her complaints and her termination.

### 1. There is a Causal Connection Between Barnhart's Report and Regions' Retaliation

Where a protected act and an adverse action are very close in time, a causal connection may be found. *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002). Here, the temporal proximity could not be more persuasive. Barnhart made her claims of wrongful, differential, and discriminatory treatment on January 19, 2012. Later that day she received a one day suspension, and exactly two weeks later she filed a formal grievance on February 2, 2012. She was terminated the following Monday, February 6, 2012. Only 4 days separated her grievance and termination, and a mere 19 days, or 11 workdays, separated Barnhart's complaint and her termination. This proximity may establish causation. *See e.g.*, *Grover v. Smarte Carte, Inc.*, 836 F. Supp. 2d 860, 870 (D. Minn. 2011) (citing *Mathews v. Trilogy Commc'ns, Inc.,* 143 F.3d 1160, 1166 (8th Cir.1998) and *Keys v. Lutheran Family & Children's Servs. of Mo.,* 668 F.2d 356, 358 (8th Cir.1981) for the proposition that time lapse of two months or less created inference of causation).

### 2. *Barnhart Can Establish Pretext for her Reprisal Claim*

Barnhart has met her burden of showing retaliatory pretext based upon the evidence presented above in § II. C.


## CONCLUSION

For the foregoing reasons, Barnhart respectfully requests the Court deny Regions' Motion for Summary Judgment in its entirety.


**HALUNEN & ASSOCIATES**

Dated:  September 20, 2013

By: /s/ Ross D. Stadheim           ____
Clayton D. Halunen #219721
Ross. D. Stadheim #392475
Shaun M. Parks #393324
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099

*ATTORNEYS FOR PLAINTIFF*