## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michele Barnhart,                                            Civil No. 12-2089 (DWF/FLN)

                Plaintiff,

v.                                                                      **MEMORANDUM**
                                                                    **OPINION AND ORDER**

Regions Hospital,

                Defendant.

---

Barbara J. Felt, Esq., Clayton D. Halunen, Esq., Ross D. Stadheim, Esq., and Shaun M. Parks, Esq., Halunen & Associates, counsel for Plaintiff.

Cynthia A. Bremer, Esq., and Jaime N. Cole, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Regions Hospital ("Regions") (Doc. No. 15), in which Regions requests that the Court award summary judgment as to the employment discrimination claims brought against it by Plaintiff Michele Barnhart ("Barnhart"). For the reasons set forth below, the Court denies the motion in its entirety.

## BACKGROUND

In January 2008, Barnhart was hired by Regions as a Scheduling Specialist—Neurosurgery. (Doc. No. 18, Cole Decl. ¶ 5, Ex. A ("Barnhart Dep.") at 66-67 & Ex. 4.) In her position, Barnhart's duties included scheduling patient appointments, registering

patients, verifying patient information and insurance, assisting physicians in

administrative duties, answering phone calls, and communicating benefit changes to

members.  (*Id*. at 96-97 & Ex. 9.)  Barnhart's work schedule required her to be at work

from 8:00 a.m. to 5:00 p.m.  (*Id*. at 98-99.)

   Barnhart's first supervisor was Cheryl Sarno ("Sarno"), a Nurse Clinician for

Neurosurgery.  (*Id*. at 72.)  Sarno reported to Linda Moses ("Moses"), Specialty

Operations Manager for Neurosciences.  (*Id*. at 72, 80; Cole Decl. ¶ 6, Ex. B ("Moses

Dep.") at 6-9.)  Jill Goring ("Goring") supervised Barnhart from early 2011 through

summer 2011.  (Barnhart Dep. at 78.)  Moses took on Goring's supervisory roles for

certain individuals, including Barnhart, after Goring accepted a new position in

August 2011.  (Moses Dep. at 10, 14-20; Barnhart Dep., Ex. 6.)  Carol Droegemueller

("Droegemueller") also became an interim supervisor at some point after Moses, during

which time she supervised Barnhart and three other employees.  (Cole Decl. ¶ 9, Ex. E

("Droegemueller Dep.") at 5, 6, 15.)  While acting as supervisor, Droegemueller would

"lean on" Moses to consult on certain issues, including issues relating to Barnhart's

schedule and attendance.  (*Id*. at 30.)

   In March 2010, Barnhart was diagnosed with Factor V Leiden.[1]  (Barnhart Dep.

at 100.)  Barnhart was, among other things, prescribed Coumadin and told she must:

limit the amount of time she sits and/or stands; wear TED stockings; eat a diet high in

---

[1]     Factor V Leiden is a disease that causes blood to over-clot and can cause
thrombosis and pulmonary embolisms if not managed.  (Doc. No. 25, Barnhart Decl. ¶ 3.)

iron; and utilize a particular type of birth control.  (*Id*. at 267-68, 275-76.)  In her

Declaration, Barnhart claims that flare-ups of her disease (when blood clots are active)

cause pain and difficulty walking, exercising, or engaging in other activities, as well as

headaches, stomach aches, and cramping.  (Barnhart Decl. ¶ 3.)[2]

Barnhart had a total of four blood transfrusions during the spring and summer

of 2011.  (Barnhart Dep. at 111-12, 257-58.)   In addition, Barnhart had to have blood

work done two to three times per week to monitor her condition.  (*Id*. at 111.)  However,

by her own count, Barnhart estimated that, after her diagnosis, she had her blood drawn a

total of 16 times during the over eighteen months she worked at Regions.  (*Id*. at 197-98.)

Barnhart contends that it became difficult for her to work on her normal schedule, which

required her to be at work at 8:00 a.m.  (*Id*. at 100.)

In July 2010, Barnhart submitted a request for intermittent FMLA leave to

accommodate her Factor V Leiden condition, and her request was approved.  (Barnhart

Dep. at 269 & Exs. 26, 33.)  Her request was based on her physician's medical

---

[2]    Barnhart's Declaration was submitted after her deposition.  Barnhart claims that
the declaration supplements her deposition testimony, but Regions claims that it directly
conflicts with her testimony and is, therefore, inadmissible.  Under the sham affidavit
doctrine, a district court may strike an affidavit that conflicts with deposition testimony
and raises only sham issues of material fact.  *See City of St. Joseph, Mo. v. Sw. Bell Tel.*,
439 F.3d 468, 475-76 (8th Cir. 2006) ("If a party who has been examined at length on
deposition could raise an issue of fact simply by submitting an affidavit contradicting his
own earlier testimony, this would greatly diminish the utility of summary judgment as a
procedure for screening out sham issues of fact.").  However, where the affiant attributes
the contradictory testimony to confusion at his or her deposition or the need to explain
unclear portions of deposition testimony, the district court is not to strike the affidavit.
*Id*.  The Court will address any material issues of admissibility below.

certification, which indicated Barnhart would need time for blood work and transfusions. (*Id*. at 198-205 & Exs. 26, 33.)  The certification specifically indicates that Barnhart's condition will *not* "cause episodic flare-ups periodically preventing the employee from performing his/her job functions" and that she will *not* require a reduced or part-time work schedule.  (*Id*., Ex. 26.)  Barnhart also spoke with Goring, her supervisor, who assured Barnhart that she would accommodate her schedule.  (*Id*. at 202.)

Regions initially provided Barnhart with a flexible start time for the days on which she needed to have blood work, allowing her to come in between 8:30 and 9:00 a.m.  (*Id*. at 175-79.)  Barnhart claims that if she was going to be late, she would call a supervisor or a co-worker.  (*Id*. at 125.)

Regions asserts that in January 2011, Barnhart began exhibiting performance deficiencies.  On January 21, 2011, Barnhart was counseled on her performance, at which time Barnhart was told she had difficulty with the accuracy and thoroughness of scheduling and documentation.  (*Id*. at 173-75 & Ex. 19.)[3]  Barnhart was counseled again in September 2011, based on several scheduling-related complaints from other department supervisors and staff.  (*Id*. at 167-73 & Exs. 15, 18; Moses Dep. at 37-46.)  In October 2011, Barnhart received a written reprimand issued by Moses for performance

---

[3]     In late August 2011, Moses assumed the role of interim supervisor over Barnhart and four other employees.  (Moses Dep. at 17-18.)  Barnhart told Moses of her medical condition and need for blood work.  (*Id*. at 78; Barnhart Decl. ¶ 6.) Barnhart claims that her flexible start time became less flexible under Moses' supervision.

issues.  (Barnhart Dep. at 161-63 & Ex. 12; Moses Dep. at 91-96 & Exs. 3, 4.)  The notes

from the related employee-supervisor conference read in part:

> This has an impact on external customers, internal coworkers, leaders,
> surgeons and patients.  It causes lack of satisfaction in customers not being
> responded to, lack of accountability regarding who was contacted and
> delays in responses.  Since others on the team have repeatedly experienced
> your lack of follow-through, this has created inefficiency and workarounds
> for others on the team, and dissatisfaction and lack of confidence in your
> performance as others see you as unreliable.

(Barnhart Dep., Ex. 12.)  Additional complaints were made regarding Barnhart's

performance.  (*Id.*, Exs. 16-17.)

Regions also asserts that Barnhart had attendance and tardiness issues.[4]  In

September or October 2011, Barnhart was informed that she was required to page Moses

if she was going to be late (meaning past her 9:00 a.m. start time) or absent, so that

Moses would know whether and when Barnhart would be at work, and so Moses could

ensure proper staffing.  (Moses Dep. at 84, 88 & Ex. 4.)  Barnhart acknowledges that

between November 17, 2011 and January 6, 2012, she had twelve documented start times

after 9:00 a.m.  (Barnhart Dep., Ex. 12.)  Barnhart claims that those late starts occurred

on days when she attempted to have blood work[5] or when she felt ill because of her

---

[4]     Goring supervised Barnhart in early 2011, at which time Goring expressed
concern to Kathy Agerbeck ("Agerbeck"), a Human Resources ("HR") business partner
at Regions, about Barnhart's attendance.  (Cole Decl. ¶ 8, Ex. D ("Agerbeck Dep.")
at 23-24.)

[5]     Barnhart claims that the labs were sometimes too busy for her to receive treatment
and, therefore, there was no record of her visit.  (Barnhart Dep. at 196-97.)

condition.  (Barnhart Decl. ¶ 5.)  During her deposition, however, Barnhart acknowledged that she was late on occasion for reasons that included "running late," "not feeling well," and taking her daughter to an appointment.  (Barnhart Dep. at 180-86.)  Also during her deposition, Barnhart was unable to recall an occasion when she was late because she was having blood work done or any appointment she had to cancel because of work.  (*Id.* at 181-82, 249-56.)[6]

Barnhart claims that Moses told her that she could not schedule medical appointments during work hours.  (Barnhart Dep. at 299-300.)  When Droegemueller became Barnhart's supervisor, Droegemueller advised Barnhart that she needed to inform Droegemueller if she was going to be late (after 9:00 a.m.).  (Droegemueller Dep. at 22-23.)

On January 9, 2012, Barnhart received an email from Moses inquiring about her start time:  "What is your regular start and stop time?  I'm approving timecards and there is a lot a [sic] variation in your start times."  (Barnhart Dep., Ex. 21.)  Barnhart responded:  "I thought we agreed if I got here from 8:30 to 9:00 [sic] if this has changed I will make it one or the other.  I was adjusting my [FMLA] time so I didn't have to take time off during the day for bloodwork and such."  (*Id.*)

---

[6]     In her Declaration, Barnhart claims that when she was late, "it would be because I was attempting to have my blood tested . . . or because my disorder was making me feel ill."  (Barnhart Decl. ¶ 5.)  However, this conflicts with her deposition testimony that she, at least on occasion, was late for non-medical reasons.

In the evening of January 12, 2012, Barnhart slipped and fell in a St. Paul parking lot, suffering injuries to her head and face. (Barnhart Dep. at 137-40.) Barnhart claims that the next morning, January 13, she notified two former supervisors and a co-worker of her fall and that she was going to seek medical attention. (*Id*. at 150.) Barnhart did not call her current supervisor. (*Id*. at 137-56.) Barnhart provided a doctor's note and returned to work on January 17, 2012. (*Id*. at 243.)

Moses pulled and reviewed Barnhart's time records. (Moses Dep. at 102-03.) Droegemueller discussed Barnhart's attendance issues with Moses and Agerbeck. (Droegemueller Dep. at 29-31, 46-47.) On January 19, 2012, Droegemueller and Agerbeck met with Barnhart to discuss her attendance issues and failure to follow the arrangements for calling her supervisor when she would be late. (Agerbeck Dep. at 28-30.) During this meeting, Barnhart stated that she felt she was being treated differently because of her disability. (Barnhart Dep. at 298-99.) For example, Barnhart stated:

> I said I felt I was being discriminated against. I was the only one that had to get FMLA paperwork for absences or when I was gone. I had to get a doctor's note. . . . I was told that I needed to schedule my appointments around work scheduled hours, if I had anything to schedule. They didn't want me to do it in the morning or – I couldn't do it in the morning, because sometimes I was there till after 9:00, so just sometimes I would just leave, and I couldn't schedule them after 2:00.

(*Id*.) On that same day, Barnhart was suspended for one day (January 20, 2012) without pay for "continued excessive tardiness" and not reporting properly, and for failing to contact a supervisor for absences on December 18, 2012 and January 13, 2012. (Agerbeck Dep. at 49-53 & Exs. 1, 4.)

On February 2, 2012, Barnhart filed a grievance related to her suspension.

(Barnhart Dep. at 211-218 & Ex. 27.)  Her grievance stated, in part:

> B.) It had been agreed upon by my previous supervisors Cheryl Sarno and
> Jill Goering [sic] that I could flex my start times periodically because I was
> on FMLA for a blood disorder, in which I was subject to frequent INR's,
> Labs, and Transfusions.  [Moses] had asked me verbally that I schedule
> these so they did not interfere with phone coverage at the end of the day, so
> I agreed to schedule accordingly for coverage purposes.

> C.) In the past I had always contacted my co-worker to let her know that I
> would not be in due to illness, because of her early start time, it was never
> an issue prior to this, with other supervisors.

(Barnhart Dep., Ex. 27.)

In 2011, Denis McCarren took on the position of Director of Neurosciences and

Orthopedics at Group Health Plan, Inc. ("GHI").  (Cole Decl. ¶ 7, Ex. C ("McCarren

Dep.") at 9.)[7]  GHI is a separate employer from Regions under the HealthPartners

umbrella.  (Moses Dep. at 18-25.)  In his new position as the director of two service lines

(Neurosciences and Orthopedics), McCarren determined that he wanted to create a new

position.  (*Id*. at 29-30, 33 & Exs. 1, 4, 7, 8.)  McCarren approached Moses in the

Neuroscience Department, Larson in the Orthopedics Department, and Human Resource

("HR") representatives from both Regions (Agerbeck) and GHI (Mike DeLuca) for

---

[7]     McCarren began working at Regions in 2007 as Program Manager for Spine.
(McCarren Dep. at 8.)  In late 2009 or early 2010, McCarren took a job at GHI as the
Director of Orthopedics.  (*Id*. at 8-9.)  In early 2011, McCarren became the Director of
Neurosciences and Orthopedics at GHI.  (*Id*.)  In this position, McCarren became
responsible for both the orthopedics and neurosciences departments.

guidance. (*Id*. at 30-32.)[8] The restructure resulted in the elimination of two jobs—

Barnhart's position in Neurosciences and another position in Orthopedics. (McCarren

Dep. at 45-47 & Ex. 4.) The eliminated positions were consolidated into a new union

position— Surgery Scheduling Technical Assistant/Clinical Assistant (Grade E) — and

moved from Regions to GHI. (*Id*. at 66; Ewing Dep. at 56; Moses Dep. at 27.) The new

position involved a reporting structure change and new responsibilities, such as surgery

scheduling. (McCarren Dep. at 37; Moses Dep. at 121-22.) In particular, the new

position consisted of new patient scheduling, surgery scheduling for two orthopedic

surgeons, getting prior authorizations for patients, working with insurance companies,

getting documentation before surgery, and backing up other schedulers. (Ewing Dep.

at 21-22.) Regions submits that discussions between McCarren and Agerbeck regarding

the restructure began in early fall of 2011. (Agerbeck Dep. at 62.) The new position was

to be more substantive and would crossover with orthopedics. (*Id*. at 63.)

On February 3, 2012, Regions terminated Barnhart's employment. (Barnhart Dep.

at 165-66 & Ex. 14.) McCarren and Agerbeck explained to Barnhart that her job was

being eliminated due to a reorganization of the department that resulted in the elimination

of her position. (McCarren Dep. at 52-53; Agerbeck Dep. at 64; Barnhart Dep.

---

[8]     McCarren testified that he involved both Regions' and GHI's HR departments
because the restructure involved eliminating two positions at Regions and creating a new
position at GHI. (McCarren Dep. at 31-32.)

at 219 -20.)[9]  On or around March 26, 2012, GHI hired Kristin Ewing ("Ewing") for the

new position.  (Doc. No. 21 ("DeLuca Decl.") ¶ 8.)[10]  The new position, which was a

union position, was governed by a collective bargaining agreement that required that

employees bid for the position and provided that employees would be chosen based on

seniority, site location, and qualifications.  (*Id.* ¶ 4.)  Ewing had been with GHI for over

23 years in a variety of positions and had experience in checking-in patients, preparing

charts for doctors, scheduling for physicians and nurses, answering phones, making

appointments, and scanning medical documents.  (Cole Decl. ¶ 10, Ex. F ("Ewing Dep.")

at 6-13.)

Barnhart filed the present action in Minnesota state court on July 24, 2012.  (Doc.

No. 1., Ex. 1 ("Compl.").)  The case was removed to this Court on August 24, 2012.

(Doc. No. 1, Ex. 2.)  In her Complaint, Barnhart alleges the following claims:

(1) Violations of the Family and Medical Leave Act ("FMLA"); (2) Disability

Discrimination in Violation of the Minnesota Human Rights Act ("MHRA"); (3) Failure

to Provide a Reasonable Accommodation in Violation of the MHRA; and (4) Reprisal

---

[9]     Regions claims that Barnhart was told she could be considered for the new
position and asserts that Barnhart was encouraged to apply for any open positions at
Regions.  (Agerbeck Dep. at 64-65.)  Barnhart, however, claims that she was told that she
would *not* be eligible for a new GHI position and points to Agerbeck's notes
memorializing the meeting:  "Scheduler-Neuro position is being restructured—high
level—[Barnhart] not meeting perf. standards, would not be eligible for new role w/
GHI."  (Agerbeck Dep., Ex. 4.)

[10]     McCarren testified that Regions hired a temporary person to perform Barnhart's
duties after she left and before Ewing was hired for the new position.  (McCarren Dep.
at 60.)

Discrimination in Violation of the MHRA.  (Compl. ¶¶ 24-43).  Regions now moves for summary judgment on all counts.

## DISCUSSION

### I.   Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Disability Discrimination

In Counts Two and Three, Barnhart claims that Regions discriminated against her in violation of the MHRA.  The MHRA prohibits employers from making adverse employment decisions against an employee on the basis of the employee's disability. Minn. Stat. § 363A.08, subd. 2.  An employer also violates the MHRA by failing to reasonably accommodate "the known disability of a qualified disabled person."  *Id.* § 363A.08, subd. 6(a).

Claims arising under the MHRA are considered under the same analysis as claims arising under the Americans with Disabilities Act ("ADA").  *See Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) ("Apart from one difference not relevant here, an MHRA claim proceeds the same way as does a claim under the ADA."); *see also Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (noting that the MHRA's "materially limits" standard is less stringent than the ADA "substantially limits" standard).

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *See Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010); *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 & n.4 (8th Cir. 2007).  Under *McDonnell Douglas*, Barnhart must first establish a prima facie case of discrimination.  *Dovenmuehler*, 509 F.3d at 439.  The burden then shifts to Regions to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.*

Finally, Barnhart must show that Regions' proffered reason was a pretext for discrimination. *Id*.

A discrimination claims based on the failure to accommodate is analyzed using a modified burden-shifting analysis. *See Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). In such a case, the employee must make a facial showing that she has a disability, was qualified, and that she suffered an adverse employment action. *Id*. With respect to a failure to accommodate claim, a plaintiff must then also show that her employer knew of her disability, and that her employer failed to make a reasonable accommodation for that disability. *Kammueller*, 383 F.3d at 784. Under both analyses, the Court first considers whether Barnhart has made out a prima facie case of disability discrimination.

### A.    Prima Facie Case

To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) she was disabled; (2) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered an adverse employment action due to her disability. *See Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012).

#### 1.    Disability

Under the MHRA, a "disability" is "any condition or characteristic that renders a person a disabled person." Minn. Stat. § 363A.03, subd. 12. A person may be considered disabled under the MHRA if she "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of

such an impairment; or (3) is regarded as having such an impairment. *Id.*  Because the

MHRA does not define "major life activities," the Court looks to the interpretations of

federal anti-discrimination statutes, including the ADA for guidance. *McClain v.*

*Andersen Corp.*, 567 F.3d 956, 967 (8th Cir. 2009); *Mallon v. U.S. Physical Therapy,*

*Ltd.*, 395 F. Supp. 2d 810, 817 n.1 (D. Minn. 2005) ("Courts . . .  use the relevant [ADA]

regulations as a guide for determining whether an impairment materially limits a major

life activity.").

> The ADA defines "major life activities" as follows:
>
> (A)  In general
>
>  . . . major life activities include, but are not limited to, caring for oneself,
> performing manual tasks, seeing, hearing, eating, sleeping, walking,
> standing, lifting, bending, speaking, breathing, learning, reading,
> concentrating, thinking, communicating, and working.
>
> (B)  Major bodily functions
>
> . . . [A] major life activity also includes the operation of a major bodily
> function, including but not limited to, functions of the immune system,
> normal cell growth, digestive, bowel, bladder, neurological, brain,
> respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102.

Barnhart correctly points out that the amended version of the ADA applies

because the alleged discriminatory conduct occurred after January 1, 2009.  The Court

notes that the review of limitations under the ADA is not intended to demand extensive

analysis.  29 C.F.R. § 1630.2(j)(1)(i)-(iii); *see also Gregor v. Polar Semiconductor, Inc.*,

Civ. No. 11-3306, 2013 WL 588743, at *3 (D. Minn. Feb. 13, 2013).

Barnhart argues that, at the time of her termination, she had been diagnosed with and suffered from Factor V Leiden.  Barnhart claims that this disorder drastically impacts her circulatory system and, if not carefully monitored and treated, could cause potentially fatal blood clots.  Barnhart also submits that her disorder has impaired her reproductive functions and that pregnancy would create added risks.  Barnhart argues that, given the definitions under the amended ADA and Barnhart's condition, "Regions is hard pressed to deny Barnhart's medical condition is an impairment of a major life activity—it is a physiological disorder or condition that substantially limits major life activities such as circulation and reproduction."  (Doc. No. 23 at 26.)

The Court notes that Barnhart has submitted little record evidence of a material limitation.  During her deposition, Barnhart testified that she:  has to limit the amount of time she sits or stands; wears TED stockings; cannot play certain sports she enjoys; and experiences stress worrying about whether she will develop a blood clot.  Barnhart submits in her declaration that when she has flare-ups of her disease, she experiences symptoms such as headaches and pain.  (Barnhart Decl. ¶ 3.)  Barnhart also explains that the physical activities in which she can participate are restricted.  (*Id.*)

The Court recognizes that:

> [t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.

29 C.F.R. § 1630.2(j)(1)(iii).  Viewing the evidence in the light most favorable to Barnhart, the Court find that Barnhart meets the minimal burden of establishing that she was disabled.  Accordingly, Barnhart meets the first prong of her prima facie case.

### 2.    Qualified

The second part of a prima facie case of discrimination requires the plaintiff to prove that she is qualified to perform the essential functions of the position, with or without reasonable accommodation.  *Kallail,* 691 F.3d at 930.  In determining whether a job function is essential, the Court considers, among other evidence:  the employer's judgment as to which functions are essential; written job descriptions prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; consequences of not requiring the incumbent to perform the function; the terms of a collective bargaining agreement; the work experience of past employees on the job; and/or current work experience.  29 C.F.R. § 1630.2(n)(3).

Here, Regions has submitted evidence that attendance and punctuality were essential functions of Barnhart's position, and that Barnhart's absence or tardiness impacted her co-workers and the department.  (Agerbeck Dep. at 45, 48; Droegemueller Dep. at 36-37; Moses Dep. at 90-91.)  Courts have repeatedly recognized that regular and reliable attendance is a necessary element of most jobs.  *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 777 (8th Cir. 2001) (quotation omitted).  The Court concludes that attendance and punctuality are appropriately considered essential functions of Barnhart's job.

The record demonstrates that Barnhart has documented attendance and tardiness

issues.  Barnhart admits that she was late on several occasions for reasons other than her

FMLA-related medical condition.   (Barnhart Dep. at 180-86.)[11]  Barnhart, however,

points out that Regions asserts that she was not terminated for performance issues, but

instead was terminated because her job was eliminated.  (McCarren Dep., Ex. 3.)  Thus,

the Court concludes that there is a fact issue with respect to whether Regions considered

Barnhart's history of tardiness to be serious enough to rise to the level of making her

unqualified to perform her job.  Viewing the record in the light most favorable to

Barnhart, the Court finds that a reasonable juror could conclude that she was qualified to

do the job.  Thus, Barnhart meets the minimum burden of showing that she was qualified

under the second prong of her prima facie case.[12]

### 3.    Adverse Employment Action and Inference of Discrimination

The third prong of a prima facie case of discrimination requires Barnhart to show

that she suffered an adverse employment action on the basis of her disability.  Barnhart

argues that her termination was based on her disability.  (Doc. No. 23 at 27.)  The parties

---

[11]      In her declaration, Barnhart states that when she was late to work it was "because [she] was attempting to have [her] blood tested through INR's at a clinic, or because [her] disorder was making [her] feel ill."  (Barnhart Decl. ¶ 5.)  This declaration is contradictory to testimony given at her deposition, wherein Barnhart acknowledged that there were times she was late for non-medical reasons, such as having a sick child or just running late.

[12]      Moreover, Barnhart has made a facial showing that she could perform the essential functions of her job with a reasonable accommodation, namely a flexible start time.  *See Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003) ("If the employee establishes that she cannot perform the essential functions of the job without accommodation, she must also make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job.").

dispute whether the evidence is sufficient to give rise to an inference of discrimination. The Court notes that the evidence required at this stage of the analysis is minimal. *Young v. Warner-Jenkinson, Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998).   Viewing the evidence in the light most favorable to Barnhart, the Court determines that Barnhart has submitted sufficient evidence at the prima facie stage to support the existence of a causal connection between her disability and the alleged adverse employment actions.  The nature of the record is discussed below in the Court's analysis of pretext.

### B.      Disparate Treatment—Legitimate Reason and Pretext

Under *McDonnell Douglas*, once the plaintiff establishes a prima facie case, the employer must articulate a legitimate nondiscriminatory reason for its actions.  *Burchett*, 340 F.3d at 516–517.  The Court concludes that Regions has put forth a legitimate, nondiscriminatory reason for Barnhart's termination.  In particular, Regions submits that Barnhart was terminated because her job was eliminated in a restructure of her department.  Once an employer articulates a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.  *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012).

Barnhart argues that fact issues exist and that Regions' reason for termination are not the true reason for her termination, but a pretext for discrimination.  To carry her burden of showing pretext, Barnhart must show that the proffered justification for the adverse employment action is "unworthy of credence."  *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001).  In addition, to avoid summary judgment,

Barnhart must present evidence that creates a reasonable inference that her disability was a determinative factor in her dismissal.  *Young*, 152 F.3d at 1023; *see also Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996) (noting that the focus of inquiry at the summary judgment stage "always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].").

Barnhart argues that circumstances around the restructure that resulted in the termination of Barnhart's position are suspicious; particularly because the restructure involved the creation of a single new position.  In addition, Barnhart was terminated effective immediately and was not allowed to continue working at her position while the new position was filled, yet Ewing was not hired to fill the new position for more than a month after Barnhart was terminated.  Also, Barnhart has submitted evidence that someone else temporarily filled the position which Barnhart vacated.  Barnhart futher asserts that the new position was very similar to her eliminated position and that a large percentage of the duties were the same as those Barnhart was performing.

With respect to Regions' stated reason for terminating her, Barnhart submits evidence suggesting that the explanation shifted and was inconsistent.  For example, Barnhart was told by McCarren and Agerbeck that her position was being eliminated as part of a restructure.  While Regions claims that Barnhart was encouraged to apply for the new position, Agerbeck's notes memorializing the termination meeting state that

Barnhart was not meeting performance standards and would not qualify for the new position.[13]

Regions submits that Barnhart's evidence of pretext fails and asserts that the record evidence supports its decisions regarding Barnhart's employment.  Regions relies on the following to support its employment decisions with respect to Barnhart:  Regions granted Barnhart's FMLA request in 2010; Regions allowed Barnhart to come in late to accommodate her blood tests; Regions eliminated Barnhart's job due to a restructure; McCarren, the architect of the restructure, did not know of Barnhart's alleged disability; the new position was very different from Barnhart's eliminated position; and there were no comparators who were treated more favorably than Barnhart.

Viewing the record as a whole and the evidence in the light most favorable to Barnhart, the Court concludes that there are genuine issues of fact as to whether Regions' reasons for terminating Barnhart are a pretext for disability discrimination.  For example, there are a number of issues of fact relating to the true reason Barnhart was terminated. A reasonable juror, looking at the evidence before the Court, could conclude that Regions terminated Barnhart because it was dissatisfied with her attendance and failure to call her supervisor when she was going to be late or absent.  Yet, Regions claims to have

---

[13]     Barnhart also claims that she was treated differently than similarly-situated co-workers who were not disabled.  For example, Barnhart asserts that she was held to a different standard with respect to how she was required to call in when she was going to be late and asserts that a co-worker was treated more favorably during the claimed restructuring.  The credibility of this evidence will be properly weighed by a jury in the event that this case proceeds to trial.

terminated Barnhart because of a restructure.  This inconsistency calls into question the

true reason for Barnhart's termination.  In addition, there are factual issues with respect to

the circumstances surrounding the restructure and Barnhart's termination that could lead

a reasonable juror to conclude that Barnhart's disability was a factor.  Regions claims that

McCarren did not know of Barnhart's disability, but McCarren testified that he partnered

with Moses, who did have knowledge of Barnhart's condition, while crafting and

implementing the restructure.  Finally, the timing of Barnhart's termination raises

suspicion, as she was terminated the day after she filed a grievance and roughly two

weeks after she complained about disparate treatment during a January 19, 2012 meeting

with Droegemueller and Agerbeck.[14]   For the above reasons, the Court denies Regions'

motion for summary judgment on Barnhart's disability discrimination claim (Count

Two).

> ### C.      Failure to Accommodate

Barnhart also asserts that Regions failed to provide her a reasonable

accommodation.  An employer violates the MHRA by failing "to make reasonable

accommodation to the known disability of a qualified disabled person."  Minn. Stat.

§ 363.03, subd. 1(6).  The burden shifting analysis, and corresponding burdens of proof

and production, are "modified" for failure to accommodate claims, and thus differ from

the analysis for disability disparate treatment claims.  *See Peebles v. Potter*, 354 F.3d

---

[14]      Regions asserts that there is no evidence that McCarren or Agerbeck knew of
Barnhart's grievance.  Their knowledge, however, is a fact issue to be determined by a
jury.

761, 765-68 (8th Cir. 2004).  This is because a failure to accommodate claim does not

turn on an employer's intent or motive.  *Id*.

To establish a claim for failure to accommodate, Barnhart must show that Regions

knew of her disability and failed to make a reasonable accommodation for that disability.

*Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 842 (8th Cir. 2003).  The

Court first concludes that there is sufficient evidence to lead a reasonable juror to find

that Regions knew of Barnhart's disability.  While Regions asserts that mere awareness

by supervisors of an employee's medical condition is not sufficient to establish

knowledge of a disability, the question of whether Regions knew of Barnhart's disability

is one for the jury.  Second, while there was no formal request for an additional

accommodation, the law does not require a formal request.  Barnhart need only make it

clear that she wants assistance for her disability.  *See Fjellestad v. Pizza Hut of Am., Inc*.,

188 F.3d 944, 952 n.5 (8th Cir. 1999).

The record demonstrates that Barnhart was initially granted intermittent FMLA

leave to accommodate her need to have regular blood work.  Barnhart testified that she

interpreted the accommodation to allow her a flexible start time, and that her first two

supervisors permitted her to follow her interpretation of the accommodation.  Barnhart

also submits evidence that after Moses became her direct supervisor, her start time

became less flexible, so as to make it difficult for her to schedule her medical

appointments.  Further, Barnhart claims that her requests to Moses for FMLA leave time

were ignored and that she was told that she had to schedule her blood work around her

work schedule.  (Barnhart Dep. at 88.)  Moses denies that Barnhart claimed that she

needed an accommodation to start work later than 9:00 a.m.  The divergent testimony creates a fact issue, to be decided by a jury, as to whether Barnhart requested an accommodation and whether any such accommodation would be reasonable.  In sum, there is enough evidence in the record to support a finding that Barnhart indicated that her start time did not allow her to get her necessary blood work completed.  For these reasons, the Court concludes that Barnhart has submitted sufficient evidence to support her failure to accommodate claim, and Regions' motion for summary judgment as to Count Three is denied.[15]

## III.  Reprisal Under the MHRA

Barnhart also asserts a claim for reprisal under the MHRA.  "A prima facie case of unlawful retaliation requires a showing that the employee engaged in some form of

---

[15]     The Court notes that Barnhart's discrimination claims are not particularly strong and that there is evidence in the record that will likely make it difficult for Barnhart to ultimately prevail.  For example, the record demonstrates that Barnhart submitted a Certification of Health Care Provider requesting FMLA leave that indicates that Barnhart would *not* need part-time or a reduced work schedule to attend follow-up appointments and that while her condition will cause episodic flare-ups, those would *not* prevent her from performing her job function.  (Barnhart Dep., Ex. 26.)  In addition, there is evidence suggesting that Barnhart failed to properly phone-in when she was going to be late or absent and that she did not always use her flexible start time to accommodate her medical condition, but rather for personal reasons.  Finally, the record also demonstrates that Regions initially accommodated Barnhart's medical condition by adjusting her work schedule so that Barnhart could get her necessary blood work.  Based on this record, and in particular the evidence that Barnhart also used her adjusted start schedule for non-medical reasons, a jury could conclude that Regions did not fail to make a reasonable accommodation.  However, because there are also facts supporting Barnhart's claims, this evidence cannot defeat Barnhart's claims on summary judgment.  The Court cautions Barnhart that this evidence will most certainly weigh against her before a jury.

protected activity, that the employee was subject to adverse employment action, and that the adverse action was causally connected to the protected activity." *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 845 (8th Cir. 2002); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010). If a prima facie showing is made, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse action, at which time the burden shifts back to the plaintiff to show the reason was a pretext for discrimination. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983).

Barnhart asserts that during the January 19, 2012 meeting with Droegemueller and Agerbeck, she complained that she was being subjected to discrimination based on her disability. Later that same day, Barnhart received a one-day suspension. Barnhart then filed a grievance on February 2, 2012, and Barnhart was terminated on February 3, 2012.

The Court concludes that, viewing the evidence in the light most favorable to Barnhart, fact questions remain with respect to Barnhart's claim of reprisal. First, Barnhart has raised factual issues as to whether she engaged in protected activity by complaining of unequal treatment during the January 19, 2012 meeting and again when filing a grievance on February 2, 2012.[16] Second, Barnhart has set forth sufficient

---

[16]  Regions argues that the Barnhart's complaint during the January 19, 2012 meeting does not constitute a good faith report because Barnhart testified that she felt that the unfair treatment that she received at Regions was based upon "cliquiness" between groups within her department. (Barnhart Dep. at 207-08.) In addition, Regions points out that Barnhart claims that she "felt" management was singling her out for retaliation for missing work and that she "thinks" management had a problem giving her flex time because they asked her not to schedule medical appointments during work. (*Id*. at 11-13,

(Footnote Continued on Next Page)

evidence of a causal connection between her reports and her termination.   Barnhart

---

(Footnote Continued From Previous Page)

252-55.)   At her deposition, Barnhart described her meeting with Droegemueller as
follows:

> I just told [Droegemueller] that I had tried to talk to [Moses] and meet with
> [Moses] on numerous occasions regarding my time, it wasn't working out
> for me, and the meetings were canceled, and I felt like they weren't
> accommodating me, or I basically felt like they were ignoring me, and I had
> reached out and nothing was done about it.
> . . .
> [Droegemueller] offered to talk to [Moses] for me, and she agreed that
> things were not right in the department. . . . She just said she understood
> what I was talking about and she's seen it for herself, that there is unfair
> treatment and cliquiness, and as a supervisor, she was going to work on
> that.

(*Id.* at 207-08.)   However, later in her deposition, while being questioned by her attorney,
the following exchange occurred:

> Q:      Did you ever indicate to [Droegemueller] or [Agerbeck] during this
> meeting that you felt that you were being discriminated against on account
> of your disability?
> A:      Yes.
> Q:      What specifically did you say?
> A:      I said I felt like I was being discriminated against.  I was the only
> one that had to get FMLA paperwork for absences or when I was gone.  I
> had to get a doctor's note.
> . . . .
> I was told that I needed to schedule my appointments around work
> scheduled hours, if I had anything to schedule.  They didn't want me to do
> it in the morning or—I couldn't do it in the morning, because sometimes I
> was there till after 9:00, so just sometimes I would just leave, and I couldn't
> schedule them after 2:00.

(*Id.* at 298-99.)   The Court concludes that Barnhart has set forth sufficient evidence that
her complaint voiced in the January 19, 2012 meeting supports a good faith and
reasonable belief that Regions' conduct was discriminatory, and therefore that she
engaged in protected activity.

contends that the reduced flexibility afforded her under Moses' supervision did not allow her adequate time to have necessary blood work to manage her condition, but rather than working with Barnhart to accommodate her medical needs, Barnhart was suspended for tardiness and, later, terminated.  The timing of Barnhart's termination raises suspicion. Finally, for the reasons already discussed above, Barnhart has produced sufficient evidence to support a finding that Regions' reason for her termination (the restructure) was pretext for discrimination.  For these reasons, Regions' motion for summary judgment on Barnhart's claim for reprisal under the MHRA (Count  Four) is denied.

## IV.    FMLA Violation

Under the FMLA, employers are prohibited from retaliating against employees for asserting rights under the Act.  29 U.S.C. § 2615(a)(2).  To establish a prima facie case of FMLA retaliation, a plaintiff must show that "she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) (citations omitted).  "The ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011).

Regions moves for summary judgment on this claim, arguing that Barnhart cannot prove the third element—causation.  (Doc. No. 17 at 31.)  In particular, Regions argues that the timing does not support Barnhart's claims, pointing out that Regions granted Barnhart FMLA leave in July 2010 and suspended her in January 2012.  Regions also

submits evidence that it allowed Barnhart to take her intermittent FMLA leave even when she was not getting blood work for over eighteen months, that Regions allowed her to start after 9:00 a.m. if she called in, and that Regions never tracked Barnhart's intermittent FMLA leave in order to get the flex start time she requested.

Barnhart asserts that the gap in time does not break the causal link in this case because her termination occurred after a change in supervisors. Barnhart submits that the initial flexibility offered to her in terms of her start time was taken away when Moses and Droegemueller assumed supervisory roles over Barnhart. Specifically, Barnhart testified that she was told not to schedule appointments or to seek treatment during certain times of the day. Should a jury ultimately believe that the flexibility accorded Barnhart with respect to seeking FMLA medical treatment for her condition was scaled back under Moses and Droegemueller, and that Barnhart complained about the scaling back of flexibility, the jury could also conclude that Regions retaliated against Barnhart when it terminated her in February 2012.

## CONCLUSION

For the reasons discussed above, the Court concludes that fact issues remain as to all of Barnhart's claims in this action.  Thus, Regions' motion for summary judgment is properly denied.  The Court cautions Barnhart that the denial of summary judgment is not tantamount to victory at trial.  While not sufficient to warrant summary judgment at this stage, it appears to the Court that certain evidence in the record will make recovery at trial difficult for Barnhart.  The Court notes that, on the record before it, the best interests of the parties will likely be served by a negotiated resolution to this dispute.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED** that Regions' Motion for Summary Judgment (Doc. No. [15]) is **DENIED**.

Dated:  January 15, 2014                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge